## IN THE CIRCUIT COURT FOR BALTIMORE CITY, MARYLAND

MICHAEL S. DAY, JR. As Personal    :
Representative and Administrator of the    :
Estate of Michael S. Day, Sr. and on behalf   :
Of all others similarly situated.    :
P. O. Box 421    :
Glen Fork, WV 25845    :

          AND              :

CHRISTI ANN JORDAN JARRETT    :
As Personal Representative and    :
Administrator of the Estate of    :
Junior McCoy Barr and on behalf of all    :
Others similarly situated    :
16403 Holly Crest Lane, Apt. 211    :
Huntersville, NC 28078    :

          Plaintiffs,         :

v.                        :

JOHNS HOPKINS HEALTH SYSTEM    :
CORPORATION d/b/a The Johns Hopkins   :
Hospital    :
600 N. Wolfe St.    :
Baltimore, MD 21205    :

     **Serve:**           :
     Joanne E Pollak, Esq.    :
     600 N. Wolfe St.    :
     Administration 414    :
     Baltimore, MD 21205    :

          AND              :

THE JOHNS HOPKINS HOSPITAL, INC.   :
d/b/a The Johns Hopkins Hospital    :
600 N. Wolfe St.    :
Baltimore, MD 21205    :

     **Serve:**           :
     The Johns Hopkins Hospital

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED.**

1

Legal Department
Admin 400
600 N. Wolfe St.
Baltimore, MD 21287

    AND

JOHNS HOPKINS IMAGING, LLC
601 N. Caroline St.
JHOC 4210
Baltimore, MD 21287

    **Serve:**
    Joanne E. Pollak, Esq.
    General Counsel
    BRB Suite 102
    733 North Broadway
    Baltimore, MD 21205

    AND

THE JOHNS HOPKINS UNIVERSITY
d/b/a Johns Hopkins Hospital
Charles & 34th St.,
Baltimore, MD 21218

    **Serve:**
    Arthur P. Pineau
    Interim General Counsel
    113 Garland Hall
    3400 N. Charles St.
    Baltimore, MD 21218

    AND

PAUL WHEELER, MD
Johns Hopkins Hospital
Department of Radiology
600 North Wolf St.
Central Viewing Facility/Room 127
Baltimore, MD 21287

          Defendants.

2

## CLASS ACTION COMPLAINT

*COME NOW* Plaintiffs, on behalf of the Estates they each represent and on behalf of all others similarly situated, make this Complaint for their cause of action and state the following in support thereof:

## PARTIES

1. Plaintiff Michael S. Day, Jr. is a resident of the State of West Virginia, the surviving son of Michael S. Day, Sr., and the administrator of the Estate of Michael S. Day, Sr.

2. Plaintiff Christi Ann Jordan Jarrett is a resident of the State of North Carolina, the surviving daughter of Junior McCoy Barr, and the administrator of the Estate of Junior McCoy Barr.

3. Defendant Johns Hopkins Health System Corporation is a domestic corporation doing business in the State of Maryland.

4. Defendant The Johns Hopkins Hospital, Inc. is a domestic corporation doing business in the State of Maryland.

5. Defendant Johns Hopkins Imaging, LLC is a domestic limited liability company doing business in the State of Maryland.

6. Defendant The Johns Hopkins University is a domestic corporation doing business in the State of Maryland.

7. Defendant Paul Wheeler, MD is radiologist licensed to practice in the State of Maryland and an actual and apparent agent of each of the aforementioned Defendants.

## JURISDICTION

8. This claim exceeds the required jurisdictional amount of $30,000.00.

9. This Court has personal jurisdiction over each named Defendant pursuant to Md. Code, Courts and Judicial Proceedings §§ 6-102 and 6-103.

10. Venue lies in the Circuit Court for Baltimore City by virtue of the fact that the acts and omissions complained of occurred in Baltimore City and Defendants maintain their headquarters and principal places of business in Baltimore City.

## SUMMARY OF THE CASE

11. Each of the preceding paragraphs is incorporated by reference herein.

12. Defendants Johns Hopkins Health System Corporation, The Johns Hopkins Hospital, Inc., Johns Hopkins Imaging, LLC, The Johns Hopkins University (collectively referred to hereafter as "Johns Hopkins"), and Dr. Wheeler and the Johns Hopkins "Black Lung Program" have engaged in a pattern and practice with the intent to defraud at least hundreds of toxically injured coal miners of federally earned benefits.

13. Pneumoconiosis is a general term given to any lung disease caused by dusts that are breathed in and then deposited deep in the lungs causing damage. Pneumoconiosis is usually considered an occupational lung disease, and includes asbestosis, silicosis and coal workers' pneumoconiosis (CWP), also known as "Black Lung Disease."

14. In response to this occupational, and known-to-be-fatal disease, the federal government established a compensation program under the Federal Coal Mine

4

Health and Safety Act of 1969, *i.e.* 30 USC § 901, *et seq.* (hereinafter "Black Lung Benefits Act" or "BLBA")

15. The BLBA established, in part, a benefits program for workers at coal mines who contracted Coal Workers' Pneumoconiosis ("CWP"), with stringent requirements for determinations as to the diagnosis of CWP. These coal miners often were seeking total disability, or may have been seeking benefits owed for loss of life entirely.

16. These requirements dictate that when a chest x-ray was evaluated for the presence of CWP, the radiologist would engage in review and classification of the findings pursuant to the International Labour Organization (hereinafter "ILO") classification system. *See* 20 CFR 718.102(d).

17. Defendants established the "Johns Hopkins Black Lung Program" (hereinafter the "Black Lung Program") to take part in the determination of the presence or absence of CWP in benefit-seeking coal miners.

18. Defendants purposely and intentionally refused to abide by the stringent requirements of the Coal Act, including a disregard for 20 CFR 718.102(d) and the ILO classification system.

19. As a result of this refusal, the Black Lung Program failed to identify black lung disease in hundreds of coal workers, many of which were denied benefits as a direct and proximate result of this refusal.

5

20. As such, Plaintiffs and members of the Class they seek to represent have been denied benefits to which they were legally entitled as coal miner citizens in the United States of America.

## FACTS COMMON TO ALL CLAIMS

### The Federal Black Lung Benefits Program and The "B-Reader" Program

21. Each of the preceding paragraphs is incorporated by reference herein.

22. CWP is a known occupational disease which afflicts coal miners due to chronic inhalation of coal dust.

23. In the 1960's, it became apparent that coal miners were at risk of CWP due to their chronic exposure to coal dust, and ultimately the federal government took action in 1969.

24. In 1973, the Black Lung Benefits Act was passed stating:

Congress finds and declares that there are a significant number of coal miners living today who are totally disabled due to pneumoconiosis arising out of employment in one or more of the Nation's coal mines; that there are a number of survivors of coal miners whose deaths were due to this disease; and that few States provide benefits for death or disability due to this disease to coal miners or their surviving dependents. It is, therefore, the purpose of this subchapter to provide benefits, in cooperation with the States, to coal miners who are totally disabled due to pneumoconiosis and to the surviving dependents of miners whose death was due to such disease; and to ensure that in the future adequate benefits are provided to coal miners and their dependents in the event of their death or total disability due to pneumoconiosis.

30 U.S.C.A. § 901.

25. Ultimately, coal mine operators are liable for the payment of benefits to qualifying miners or their survivors and for payment of an excise tax to the "Black Lung Disability Trust Fund" for operation of the black lung benefits program. *See* 30

6

U.S.C. 932(b) and 26 U.S. Code § 9501. As such, coal mine operators act as the disability insurer for the coal miner employees.

26. As operators have an incentive to prevent claimants from gaining disability benefits under the BLBA, the determination of allowable benefits is adversarial in nature. however, as operators wish to prevent non-meritorious claimants from gaining disability benefits under the BLBA.

27. By 1978, it became clear that there could be wide disagreement between medical professionals as to the absence of presence of evidence of CWP on chest x-ray.

28. At that time, specifically in 1978, the Department of Health and Human Services (hereinafter "HHS") and the Department of Labor (hereinafter "DOL") promulgated federal regulations with the intent of creating a uniform system of classification of x-ray findings as it pertains to benefits under the Black Lung Benefits Program. *See* 45 C.F.R. 37.01, *et seq.*

29. The federal regulations demand that the ILO International Classification System be used to determine whether an x-ray presents evidence of pneumoconiosis. *See* 20 C.F.R.718.102(d).

30. Critically, the ILO classification system is a legal basis for establishing the presence of *clinical* or *medical* CWP, which is a necessary element of entitlement to benefits.

31. This legal diagnosis of "clinical pneumoconiosis" may differ from the standards used by physicians in the field of practice.

32. The National Institute of Safety and Health (hereinafter "NIOSH") is responsible for the creation of the "B-reader" certification program.

33. The B-reader program certifies radiologists who take advanced training in the reviewing of radiology for the presence of absence of pneumoconiosis pursuant to the ILO system with the intent to train radiologists in the application of the ILO classification system.

34. This review of chest x-rays pursuant to the ILO classification system is known as "B-reading" and the radiologists who have obtained certification to review these x-rays as "B-readers."

35. B-readers also agree to a Code of Ethics promulgated by NIOSH's B reader program. The Code of Ethics states, *inter alia*:

    a. The B Reader's primary commitment is to serve the welfare and best interests of patients, workers, and society by striving to classify chest radiographs as accurately as possible.

    b. B Readers shall respect the law; the rights of patients, other health professionals, and clients; and shall safeguard medical information and other confidences within the constraints of the law.

36. Finders of fact, such as District Directors and ALJ's reasonably believe that B-readers are reviewing radiology in conformance with NIOSH, the ILO, and the Code of Ethics.

37. BLBA regulations actually define a "B-reader" as a "physician [that] has demonstrated ongoing proficiency in evaluating chest radiographs for radiographic quality and in the use of the ILO classification for interpreting chest radiographs for pneumoconiosis and other diseases..." 20 C.F.R. 718.102(e)(2)(iii).

38. Radiologists who take part—and profit through payments for performing these reviews—are required to note findings under the ILO classification system. When

8

evaluating the presence or absence of CWP pursuant to the NIOSH definition of CWP, radiologists are not permitted to offer opinions that are in non-conformance to the ILO system.

39. NIOSH demands that B-readers who are reviewing radiographic findings that "might be" secondary to pneumoconiosis must still be classified as evidence of pneumoconiosis. *See* The Application of the ILO Radiographic Classification System (1980) ("if the findings might be secondary to pneumoconiosis, but other etiologies are also to be considered, the classification for pneumoconisosis (Sections 1A through 3D) should be completed..."); *see also* Guidelines for the Use of the ILO International Classification of Radiographs of Pneumoconioses (2000) ("No radiographic features are pathognomonic of dust exposure. Some radiographic features that are unrelated to inhaled dust may mimic those caused by dust. Readers may differ about the interpretation of such appearances... therefore, the study protocol will usually require that all appearances described in these *Guidelines* and seen on the standard radiographs *are to be classified.*") (emphasis added).

40. In assessing the radiological films under the legal definition of CWP as defined by the ILO classification system and applied by NIOSH, the role of the radiologist is solely to note specific radiographic findings that the ILO system defines as possible pneumoconiosis; the radiologist may not disregard those findings merely because he believes there are plausible explanations other than CWP or pneumoconiosis because all findings that "might be" CWP are to be classified as CWP.

9

41. Fact-finders tasked with weighing discrepancies in opinions—including Administrative Law Judge's and district benefits directors—presume that all experts are using the requisite ILO system.

42. However, regulations demand that "where two or more X-ray reports are in conflict, in evaluating such X-ray reports consideration must be given to the radiological qualifications of the physicians interpreting such X-rays." 20 C.F.R. 718.202(a)(1) (citing 20 C.F.R. 718.102(d)).

43. Therefore, a certified B-reader who is presumably following NIOSH Guidelines in applying the ILO classification system is to be given more weight than a non-B-reader as a matter of law.

44. Since 2013, it has been estimated at times that there are as few as 230 certified B-readers in the United States of America.

45. Dr. Wheeler and several radiologists in the Johns Hopkins Black Lung Program—including John Scatarige, MD—are certified B-readers, having demonstrated an understanding an *ability* to classify radiology under the ILO classification system, and passed recertification exams every four years in order to maintain their status as certified B-readers.

## Determination of Benefits

46. Each of the preceding paragraphs is incorporated by reference herein.

47. Determination of benefits is based upon the submission of a claimant to numerous potential diagnostic exams, subject to review by qualified physicians, and ultimate

determination by an administrative law judge in the event a dispute as to the presence of CWP or disability due to CWP arises.

48. Most commonly, a suffering coal miner will file his/her initial claim *pro se*. This initial claim is filed with the local "District Director's Office."

49. The Department of Labor then funds certain medical exams, most typically a clinical exam by an internist or pulmonologist, pulmonary function test, arterial blood gas study, and a chest x-ray interpreted according to the ILO Guidelines as discussed and interpreted by NIOSH in the Study Syllabus for Classification of Radiographs of Pneumoconiosis.

50. The coal mining company also has the right to obtain no more than two examinations of the miner by its own consulting physicians and to obtain interpretations of chest x-rays that can be used to defeat a miner's claim for benefits if the interpretations are negative for pneumoconiosis.

51. If either party disputes the District Director's findings, then either party can appeal those finds to an Administrative Law Judge (hereinafter "ALJ").

52. After a submission of a findings of fact and conclusions of law by an ALJ, either party may then appeal to the Benefit Review Board. Thereafter, results can be appealed directly to the appropriate federal Circuit Court of Appeals and to the Supreme Court of the United States.

53. This system of review is reliant on the application of the federal law and regulations by those physicians who offer opinions.

11

54. If physicians unilaterally determine to ignore or "modify" the law and regulations, then the system does not function justly.

## Defendants' Interpretation of Chest X-Rays

55. Each of the preceding paragraphs is incorporated by reference herein.

56. Defendants Johns Hopkins, through its Black Lung Program, and Defendant Dr. Paul Wheeler consciously chose to disregard the law, the ILO classification system, and the findings therefrom in a systematic effort to limit the awards of benefits lawfully earned by coal miners suffering from pneumoconiosis.

57. On October 29, 2013, the Center for Public Integrity began to publish a three-part expose on the manipulation of the federal black lung program in West Virginia. Part two, published on October 30, 2013, exposed the manner in which Defendants admittedly refused to abide by the ILO classification system, and substituted their own opinions in an effort to minimize the number of coal miners who would qualify for federal benefits.

58. In the report on Dr. Wheeler and Johns Hopkins, Dr. Wheeler admits that he does not use the ILO classification system in performing B-reads because in his view the system has "some quality issues." *See* https://www.publicintegrity.org/2013/10/30/13637/johns-hopkins-medical-unit-rarely-finds-black-lung-helping-coal-industry-defeat (last visited October 18, 2016).

59. The CPI report, after interviewing Dr. Wheeler, further explains:

If spots appear on the X-ray, a reader is supposed to mark their size and shape, and then explain which diseases seem more or less likely.

12

> When he reads X-rays for coal companies, however, Wheeler doesn't do this. If he sees spots on the film but thinks another disease is more likely than black lung, he marks the film as negative. He typically describes the abnormalities in the comments section, explaining why they don't meet his criteria for finding black lung. In case after case reviewed by the Center, his comments were almost identical.
>
> *Id.*

60. Defendant Dr. Wheeler also admits that he has intentionally disregarded the ILO classification system, due to his beliefs as to what the law should be. "If you think it's appropriate for somebody with sarcoid to be paid for [black lung] because he has masses and nodules — do you think that's appropriate? I don't think so." *Id.*

61. As Dr. Wheeler most succinctly stated in an interview with CPI: "I don't care about the law..." *Id.*

62. These radiological abnormalities, which Dr. Wheeler refuses to acknowledge as evidence of Black Lung Disease, support the diagnosis of CWP on a chest x-ray as a matter of law, however.

63. Instead of identifying findings consistent with the ILO classification system, or that "might be" CWP according to the ILO system, Defendants intentionally and knowingly deviated from the ILO system and suggest other diagnoses for the benefit seeker. Most commonly, Dr. Wheeler and Johns Hopkins would find that the chest x-rays were consistent with tuberculosis or histoplasmosis, neither of which permitted recovery of any benefits under the program.

64. In short, Dr. Wheeler and Johns Hopkins Black Lung Unit required higher standards than those imposed by the ILO, particularly that "the white spots that

13

show up on film must have a particular shape, appear in a specific area of the lung and follow a specific pattern." *Id.*

65. By intentionally deviating from the ILO system, and substituting non-conforming standards for x-ray findings, Johns Hopkins and Dr. Wheeler were successful in denying lawfully earned federal benefits to injured coal miners.

66. According to the CPI report, in at least 280 cases in which Dr. Wheeler successfully convinced an Administrative Law Judge to deny benefits, subsequent autopsies proved Defendants' ultimate conclusions and opinions wrong and that the miner had black lung and was deserving of benefits under the program.

67. Unfortunately, these biopsies or autopsies did not result in full benefits awards under the BLBA.

68. Other miners suffered loss in benefits due to delays in obtaining those benefits which should have been earned but for the readings and unlawful interpretations of Defendants.

69. By deviating from the federal law and regulations Defendants certified and agreed to abide by, a systematic declination of earned federal benefits was created for coal miners suffering from CWP or other forms of pneumoconiosis which entitled him/her to federal benefits under the BLBA.

70. In exchange for these opinions, Defendants both were paid by employer coal companies, and thereby retained financial benefits for deviating from the ILO classification system and the legal criteria for establishing CWP under the BLBA.

## Michael Steven Day

71. Each of the preceding paragraphs is incorporated by reference herein.

72. Michael Steve Day, Sr. was a coal miner in West Virginia for 33 years primarily with Peabody Energy Corporation ("Peabody"), one of the nation's largest coal companies.

73. Mr. Day ceased work in 2004 on the advice of his treating pulmonologist and filed a claim for federal black lung benefits because his chest x-ray showed coal workers' pneumoconiosis and his pulmonary test results revealed moderate impairment that was deteriorating.

74. The initial evaluation by a physician approved by the Department of Labor confirmed that Mr. Day had complicated pneumoconiosis and was "100% disabled for mine work due to coal workers' pneumoconiosis."

75. On appeal, Peabody relied on two negative x-ray readings by Dr. Wheeler, and one negative x-ray reading by another member of the Johns Hopkins Black Lung Unit (Dr. Scott).

76. Dr. Wheeler's negative reading of a digital x-ray, and the negative reading of a CT scan by a third member of the Johns Hopkins Black Lung Unit (Dr. Scatarige was sufficient to convince the ALJ that Mr. Day was not entitled to benefits because he did not have complicated pneumoconiosis.

77. Consequently, the ALJ denied his claim by justifiably relying upon the findings and reports of Defendants, and applying the law and regulations to those findings.

15

78. Dr. Wheeler and the other two members of his Black Lung Unit opined that Mr. Day may have radiographic evidence of tuberculosis, histoplasmosis, or some other condition, but not black lung, and they intentionally failed to classify radiographic abnormalities that were either "consistent with" or "might be" pneumoconiosis as required by the NIOSH Syllabus for Classification of Radiographs of Pneumoconiosis.

79. The Administrative Law Judge justifiably assumed that the radiologists form the Johns Hopkins' Black Lung Unit were applying the ILO Guidelines correctly and that he could rely on their reports as the basis for issuing a denial of benefits to Mr. Day.

80. In the CPI investigation, an independent B-reader stated "[i]f other physicians are reaching different conclusions about this case, that Mr. Day's findings are not dust exposure related; it gives me serious pause and concern about bias and the lack of scientific independence or credibility of these observers."

81. When Mr. Day died in 2014, his autopsy revealed "complicated coal workers' pneumoconiosis/massive pulmonary fibrosis, and extensive coal mine dust lung disease," which became the basis for an eventual award of federal black lung benefits to Mr. Day posthumously in a subsequent claim.

82. As a result of Defendants' willful refusal to interpret chest x-rays in compliance with the ILO classification system, Mr. Day was denied and never recovered certain benefits earned under the BLBA.

16

## Junior McCoy Barr

83. Each of the preceding paragraphs is incorporated by reference herein.

84. Mr. Barr was a coal miner in West Virginia for 33 years, primarily with Eastern Associated Coal Company.

85. In 1989, Mr. Barr filed a claim for federal black lung benefits in his *pro se* capacity.

86. Dr. Donald Rasmussen performed the examination authorized by DOL and found that Mr. Barr's chest x-ray revealed evidence of small opacities (r/q) in all six lung zones with a profusion of 1/2, which is consistent with CWP.

87. Dr. Rasmussen also found that Mr. Barr's pulmonary studies indicated "at least moderate loss of lung function" and Mr. Barr "did not retain the pulmonary capacity to perform very heavy manual labor" that was part of his usual coal mine work.

88. Based on these results, Dr. Rasmussen determined that Mr. Barr's clinical pneumoconiosis was "a material contributing cause of his impaired lung function."

89. Dr. Rasmussen's findings were sufficient to qualify for federal black lung benefits; however, Mr. Barr's x-rays were then interpreted as completely negative for pneumoconiosis by Dr. Wheeler and Dr. Scatarige from the Johns Hopkins Black Lung Unit.

90. Both Dr. Wheeler and Dr. Scatirage disregarded the ILO classification system and erroneously classified the x-ray as completely negative for CWP.

91. Dr. Wheeler said "CWP is very unlikely because 1) nodular infiltrates are asymmetrical, (2) involve periphery lungs and pleura; (3) are probably mixed with

17

calcified granulomata, and he is quite young" which are not appropriate reasons for excluding pneumoconiosis under the ILO classification system.

92. Similarly, Dr. Scatarige said there were "no small, central, round opacities of CWP/silicosis, which is a more stringent set of criteria than the ILO system requires.

93. The District Director's Office justifiably relied upon the reports of Drs. Wheeler and Scatarige to support a denial of benefits to Mr. Barr.

94. In a subsequent claim, Mr. Barr persisted and finally was awarded benefits posthumously in 2016. However, the award did not include past benefits already lost.

95. Mr. Day's claims for federal black lung benefits contained a total of 24 x-ray readings, and except for the readings by Dr. Wheeler and Dr. Scatarige, they were all positive for CWP.

96. Subsequently, Mr. Barr's autopsy slides were interpreted by four pathologists who all found he had at least simple CWP and possibly complicated CWP.

97. Thus, as a result of the delay in receiving benefits as a proximate result of Defendants' willful refusal to interpret chest x-rays in compliance with the ILO classification system, Mr. Barr was denied and never recovered benefits earned under the BLBA.

98. Mr. Barr passed away on October 23, 2011.

## CLASS ACTION ALLEGATIONS

99. Plaintiffs brings this action as a class action pursuant to the Maryland Rules of Civil
    Procedure 2-231(a), 2-231(b)(1), 2-231(b)(2), 2-231(b)(3), and 2-231(d) on behalf
    of the class:

### THE CLASS

> All persons nationwide who made a claim under the Black Lung
> Benefits Act, 30 USC § 901, *et seq.*, and whose radiography were
> reviewed by Defendants, and were denied or lost benefits under the
> Black Lung Benefits Act.

Excluded from the Class are Defendants, the officers, members, and directors of

Defendants, members of their immediate families and their legal representatives,

heirs, successors, or assigns, and any entity in which Defendants have or had a

controlling interest.

100.    The proposed Class is believed to be so numerous that joinder of all

members is impracticable. The exact number of members of the Class is unknown

to Plaintiffs at this time and can only be ascertained through appropriate discovery.

The proposed Class is believed to be ascertainable in that the names and addresses

of all members of the Class can be identified in business records maintained by

Defendant.

101.    Plaintiffs' claims are typical of the claims of the members of the Class

because Plaintiffs' and all Class members' claims originate from the same conduct,

practice and procedure on the part of Defendants and Plaintiffs possesses the same

interests and has suffered the same injuries as each member of the Class.

102.    Plaintiffs will fairly and adequately protect the interests of the members of
the Class and have retained counsel experienced and competent in class action
litigation. Plaintiffs have no interests that are contrary to or in conflict with the
members of the Class that Plaintiffs seeks to represent.

103.    A class action is superior to all other available methods for the fair and
efficient adjudication of this controversy, since joinder of all members is
impracticable. Furthermore, as the damages suffered by individual members of the
Class may be relatively small, the expense and burden of individual litigation may
make it impracticable for the members of the Class to individually redress the
wrongs done to them. There should be no difficulty in the management of this
action as a class action.

104.    Issues of law and fact common to the members of the Class predominate
over any questions that may affect only individual members, in that Defendants
have acted on grounds generally applicable to the entire Class. Among the issues
of law and fact common to the Class are:

    c.  Whether Defendants committed fraud in submitting their findings under the
Johns Hopkins Black Lung Program;

    d.  Whether the Defendants interfered with the occupational economic interests
of Plaintiffs and members of the Class;

    e.  Whether Defendants violated the Racketeer Influenced and Corrupt
Organizations Act;

f.  Whether Defendants negligently misrepresented facts to Plaintiffs and finders of fact;

g.  Whether Defendants were unjustly enriched;

h.  Whether Defendants engaged in a scheme to deprive Plaintiffs and members of the Class of earned federal benefits;

i.  Whether Defendants failed to apply the ILO classification system in performing readings of studies under the BLBA;

j.  Whether the Plaintiffs and the Class are entitled to damages, statutory penalties, punitive damages, and/or injunctive relief.

105.  Upon information and belief, absent a class action, Defendants' violations of the law will be allowed to proceed without a full, fair, judicially supervised remedy.

106.  Plaintiffs reserves the right to revise Class definitions and questions based upon facts learned in discovery.

## FRAUD
### Count I

107.  Each of the preceding paragraphs is incorporated by reference herein.

108.  Defendants made false representations to the Plaintiffs, members of the Class, and to the federal government and administrative law judges tasked with determining whether Plaintiffs and members of the Class were entitled to benefits under the BLBA.

109.  These false representations included:

21

a. That Defendants were "B-reading" chest x-rays consistent with the ILO and the relevant federal rules and regulations;

b. That Plaintiffs and members of the Class did not have findings consistent with Black Lung Disease that entitled Plaintiffs and members of the Class to benefits under the BLBA;

c. That Plaintiffs and members of the Class did not have CWP, pneumoconiosis or "Black Lung Disease;"

d. That Plaintiffs' and members of the Class' x-ray findings were not proximately caused by employment in coal mines as determined by federal rules and regulations;

e. Otherwise made false representations to Plaintiffs, members of the Class, and the relevant government bodies and individuals responsible for determining whether benefits were earned under the BLBA.

110. As stated above, these false statements were known to be false at the time by Defendants, and were known to be made with reckless indifference for the truth.

111. Defendants made these false statements for the purpose of defrauding Plaintiffs and members of the Class as well as unjustly enriching Defendants.

112. Plaintiffs and members of the Class relied upon these representations as they were required to have their chest x-rays and/or CT-scans read by Defendants when requested by the relevant coal mine company.

113. Further, Plaintiffs and members of the Class indirectly relied upon these representations because Defendants made these false statements to administrative

22

law judges and the appropriate fact finders who relied upon Defendants false representations in determining whether benefits should be awarded under the BLBA.

114. Plaintiffs, members of the Class, and the administrative law judges and the appropriate fact finders had the right to rely upon these false representations as Defendants represented themselves as the foremost authority on performing B-reading under the BLBA, and whose credentials alone warranted serious consideration, despite the intentional disregard of the law.

115. As a proximate and direct result of this fraud, Plaintiffs and members of the Class suffered compensable loss in the form of a complete or partial denial of benefits which can be quantified based upon the length of time in which benefits were not awarded.

116. Plaintiffs rely upon the doctrines of actual and apparent agency and *res ipsa loquitur* where appropriate.

117. **WHEREFORE**, Plaintiffs seek all damages allowable by law, including all economic damages lost for Plaintiffs and members of the Class in an amount that exceeds $75,000 in the aggregate.

## TORTIOUS INTERFERENCE WITH OCCUPATIONAL ECONOMIC INTERESTS
### Count II

118. Each of the preceding paragraphs is incorporated by reference herein.

23

119. Defendants maliciously and wrongfully interfered in Plaintiffs and members of the Class' economic relationship that was presents as part or Plaintiffs' and the Class members' occupation.

120. Defendants maliciously, wrongfully, and unlawfully interfered in these economic relationships by fraudulently and wrongfully claiming:

   a. That Defendants were "B-reading" chest x-rays consistent with the ILO and the relevant federal rules and regulations;

   b. That Plaintiffs and members of the Class did not have findings consistent with Black Lung Disease that entitled Plaintiffs and members of the Class to benefits under the BLBA;

   c. That Plaintiffs and members of the Class did not have CWP, pneumoconiosis or "Black Lung Disease" or any other compensable injury under the program;

   d. That Plaintiffs' and members of the Class' x-ray findings were not proximately caused by employment in coal mines as determined by federal rules and regulations;

   e. Otherwise made false representations to Plaintiffs, members of the Class, and the relevant government bodies and individuals responsible for determining whether benefits were earned under the BLBA that wrongfully interfered with Plaintiffs and the Class Members' occupational economic relationship.

24

121.    Plaintiffs rely upon the doctrines of actual and apparent agency, and *res ipsa loquitur* where appropriate.

122.    **WHEREFORE**, Plaintiffs seek all damages allowable by law, including all economic damages lost for Plaintiffs and members of the Class in an amount that exceeds $75,000 in the aggregate.

## VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT 18 U.S.C. 1961
### Count III

123.    Each of the preceding paragraphs is incorporated by reference herein.

124.    Defendants are in violation of the Racketeer Influenced and Corrupt Organizations Act (hereinafter "RICO") by engaging in mail fraud, obstructing justice, and finally violating federal rules and regulations related to the BLBA.

125.    Defendants engaged in a scheme to defraud by means of false or fraudulent representation, used interstate and intrastate mails to execute scheme and in connection with the scheme, to cause actual injury to Plaintiffs and members of the Class.

126.    Defendants received copies of X-Rays from coal mining companies and/or their representative law firms via interstate and intrastate mails.

127.    Defendants then further used interstate and intrastate mails to return their opinions of the chest x-rays they received to coal mining companies and the companies' representative law firms, and also to administrative law judges, for the purpose of perpetuating a fraud and scheme to cause economic injury to Plaintiffs and the Class.

25

128.    Defendants were paid, often significant sums in excess of standard x-ray review fees, to review these x-rays and provide these reports.

129.    Defendants also obstructed justice in violation of federal law by endeavoring corruptly to influence an officer of the court or the due administration of justice.

130.    Defendants obstructed justice by corruptly making efforts to influence District Directors, and Administrative Law Judges to deny benefits to coal miners who had legally sufficient signs and symptoms of Black Lung Disease that would have entitled those miners to federal benefits.

131.    Defendants are also in violation of RICO by refusing to apply the ILO classification system as the rules and regulations require, and as required by the B-reader code of ethics when assessing Black Lung Benefits under the BLBA.

132.    As a result of these acts in violation of 18 U.S.C. 1961 and 1962, Plaintiffs were wrongfully denied federal benefits which were legally earned.

133.    Plaintiffs, therefore, bring this action pursuant to 18 U.S.C. 1964 for themselves and for the Class.

134.    Plaintiffs rely upon the doctrines of actual and apparent agency, and *res ipsa loquitur* where appropriate.

135.    **WHEREFORE**, Plaintiffs seek all damages allowable by law, including all economic damages lost for Plaintiffs and members of the Class, treble damages, attorneys' fees, and costs in an amount that exceeds $75,000 in the aggregate.

26

## NEGLIGENT MISREPRESENTATION
### Count IV

136. Each of the preceding paragraphs is incorporated by reference herein.

137. Defendants at all times had actual knowledge that Plaintiffs and the finders of fact within the BLBA system would rely upon the opinions and statements that Defendants were offering. Therefore, Plaintiffs were foreseeable parties to Defendants, and Defendants owed a duty of care to Plaintiffs and Defendants.

138. Defendants negligently asserted false statements to Plaintiffs and to the finders of fact.

139. At all times, Defendants intended that their statements be acted upon both by Plaintiffs and by the finders of fact.

140. Defendants intended for Plaintiffs to believe that they did not have compensable Black Lung Disease and to stop seeking earned benefits.

141. Defendants also intended for the finders of fact to determine that Plaintiffs did not have Black Lung Disease and that benefits were not earned.

142. Defendants knew at all times that Plaintiffs and members of the Class would rely upon the statements, and that erroneous statements would cause loss to Plaintiffs and members of the Class.

143. Plaintiffs. members of the Class, and the finders of fact all justifiably relied upon the statements of Defendants, believing the law was being followed and that Defendants were in conformance with the ILO classification system.

27

144.    Plaintiffs and members of the Class suffered compensable loss in the form of a complete or partial denial of benefits which can be quantified based upon the length of time in which benefits were not awarded.

145.    Plaintiffs rely upon the doctrines of actual and apparent agency, and *res ipsa loquitur* where appropriate.

146.    **WHEREFORE**, Plaintiffs seek all damages allowable by law, including all economic damages lost for Plaintiffs and members of the Class in an amount that exceeds $75,000 in the aggregate.

## UNJUST ENRICHMENT
### Count V

147.    Each of the preceding paragraphs is incorporated by reference herein.

148.    Defendants were conferred with benefits in the form of money paid by Plaintiffs and the Class Members' employers to review their chest x-rays.

149.    Defendants had an appreciation and a knowledge of the money they were being paid to perform these exams.

150.    Further, Defendants had an appreciation and a knowledge that they were being asked to review Plaintiffs' and the Class Members' chest x-rays for the purpose of disputing that benefits were owed to Plaintiffs.

151.    Defendants have accepted and retained these benefits under such circumstances as would make it inequitable for Defendants to do so.

152.    Plaintiffs rely upon the doctrines of actual and apparent agency, and *res ipsa loquitur* where appropriate.

28

153.     **WHEREFORE**, Plaintiffs individually and on behalf of the Class ask this Court to exercise its powers in equity and to order restitution of all funds received by Defendants for reading and interpreting chest x-rays as part of the BLBA, and to return those funds to Plaintiffs and members of the Class who have been defrauded and denied benefits in an amount in excess of $75,000 in the aggregate.

## PRAYER FOR RELIEF

154.     **WHEREFORE**, Plaintiffs as individual Personal Representatives and Administrators of their respective Estates seek the following relief on behalf of themselves and the Class they seek to represent:

    a. An order certifying the class Plaintiffs seek to represent pursuant to Md. R. Civ. P. 2-231 and appointing Plaintiffs as class representative and their attorneys as Class Counsel;

    b. Judgment in favor of Plaintiffs and the Class on all issues raised herein;

    c. Damages as allowable by law in excess of $75,000 including all compensatory damages, punitive damages, attorneys' fees, treble damages, interest and costs;

    d. Compelling Defendants to establish a program or fund to reimburse Plaintiffs and members of the Class all Black Lung Benefits lost due to denials or delays caused by Defendants' actions;

    e. All other relief that this Court deems fair and just.

Date:   October 28, 2016

Respectfully submitted,

NIDEL LAW, PLLC

Jonathan B. Nace, Esq.
Christopher T. Nidel, Esq. – To be
Admitted *Pro Hac Vice*
1615 New Hampshire Ave, NW
Washington, DC 20009
(P) 202-558-2030
(F) 301-963-8135
jon@nidellaw.com

## DEMAND FOR JURY TRIAL

Plaintiffs respectfully request trial by jury on all issues raised herein.

Jonathan B. Nace, Esq.

## RULE 1-313 CERTIFICATE

This is to certify that I am an attorney licensed to practice in the State of Maryland

with an office in the District of Columbia.

Jonathan B. Nace, Esq.